[Sac. No. 7853. In Bank. June 12, 1970.]

ROBERT HARRISON KEELER, Petitioner, v.
THE SUPERIOR COURT OF AMADOR COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

620

## COUNSEL

Gard Chisholm, Don F. Howard and Richard A. Hunter for Petitioner.

No appearance for Respondent.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, and Arnold O. Overoye, Deputy Attorney General, for Real Party in Interest.

## OPINION

**MOSK, J.**—In this proceeding for writ of prohibition we are called upon to decide whether an unborn but viable fetus is a "human being" within the meaning of the California statute defining murder (Pen. Code, § 187). We conclude that the Legislature did not intend such a meaning, and that for us to construe the statute to the contrary and apply it to this petitioner would exceed our judicial power and deny petitioner due process of law.

The evidence received at the preliminary examination may be summarized as follows: Petitioner and Teresa Keeler obtained an interlocutory decree of divorce on September 27, 1968. They had been married for 16 years. Unknown to petitioner, Mrs. Keeler was then pregnant by one Ernest Vogt, whom she had met earlier that summer. She subsequently began living with Vogt in Stockton, but concealed the fact from petitioner. Petitioner was given custody of their two daughters, aged 12 and 13 years, and under the decree Mrs. Keeler had the right to take the girls on alternate weekends.

On February 23, 1969, Mrs. Keeler was driving on a narrow mountain road in Amador County after delivering the girls to their home. She met petitioner driving in the opposite direction; he blocked the road with his car, and she pulled over to the side. He walked to her vehicle and began speaking to her. He seemed calm, and she rolled down her window to hear him. He said, "I hear you're pregnant. If you are you had better stay away from the girls and from here." She did not reply, and he opened the car door; as she later testified, "He assisted me out of the car. . . . [I]t wasn't roughly at this time." Petitioner then looked at her abdomen and became "extremely upset." He said, "You sure are. I'm going to stomp it out of you." He pushed her against the car, shoved his knee into her abdomen, and struck her in the face with several blows. She fainted, and when she regained consciousness petitioner had departed.

Mrs. Keeler drove back to Stockton, and the police and medical assistance were summoned. She had suffered substantial facial injuries, as well as extensive bruising of the abdominal wall. A Caesarian section was performed and the fetus was examined *in utero*. Its head was found to be severely fractured, and it was delivered stillborn. The pathologist gave as his opinion that the cause of death was skull fracture with consequent cerebral hemorrhaging, that death would have been immediate, and that the injury could have been the result of force applied to the mother's abdomen. There was no air in the fetus' lungs, and the umbilical cord was intact.

Upon delivery the fetus weighed five pounds and was 18 inches in length. Both Mrs. Keeler and her obstetrician testified that fetal movements had been observed prior to February 23, 1969. The evidence was in conflict as to the estimated age of the fetus;[1] the expert testimony on the point, however, concluded "with reasonable medical certainty" that the fetus had developed to the stage of viability, i.e., that in the event of premature birth on the date in question it would have had a 75 percent to 96 percent chance of survival.

An information was filed charging petitioner, in count I, with committing the crime of murder (Pen. Code, § 187) in that he did "unlawfully kill a human being, to wit Baby Girl Vogt, with malice aforethought." In count II petitioner was charged with wilful infliction of traumatic injury upon his wife (Pen. Code, § 273d), and in count III, with assault on Mrs. Keeler by means of force likely to produce great bodily injury (Pen. Code, ₹ 245). His motion to set aside the information for lack of probable cause (Pen. Code, § 995) was denied, and he now seeks a writ of prohibition; as will appear, only the murder count is actually in issue. Pending our disposition of the matter, petitioner is free on bail.

I

Penal Code section 187 provides: "Murder is the unlawful killing of a human being, with malice aforethought." The dispositive question is whether the fetus which petitioner is accused of killing was, on February 23, 1969, a "human being" within the meaning of the statute. If it was not, petitioner cannot be charged with its "murder" and prohibition will lie.

Section 187 was enacted as part of the Penal Code of 1872. ■ Inasmuch as the provision has not been amended since that date, we must determine the intent of the Legislature at the time of its enactment. But section 187 was, in turn, taken verbatim from the first California statute defining murder, part of the Crimes and Punishments Act of 1850. (Stats. 1850, ch. 99, § 19, p. 231.)[2] Penal Code section 5 (also enacted in 1872)

---

[1] Mrs. Keeler testified, in effect, that she had no sexual intercourse with Vogt prior to August 1968, which would have made the fetus some 28 weeks old. She stated that the pregnancy had reached the end of the seventh month and the projected delivery date was April 25, 1969. The obstetrician, however, first estimated she was at least 31½ weeks pregnant, then raised the figure to 35 weeks in the light of the autopsy report of the size and weight of the fetus. Finally, on similar evidence an attending pediatrician estimated the gestation period to have been between 34½ and 36 weeks. The average full-term pregnancy is 40 weeks.

[2] "Murder is the unlawful killing of a human being, with malice aforethought, either express or implied. The unlawful killing may be effected by any of the various means by which death may be occasioned." The revisers of 1872 did no more than transpose

declares: "The provisions of this code, so far as they are substantially the same as existing statutes, must be construed as continuations thereof, and not as new enactments." We begin, accordingly, by inquiring into the intent of the Legislature in 1850 when it first defined murder as the unlawful and malicious killing of a "human being."

■ It will be presumed, of course, that in enacting a statute the Legislature was familiar with the relevant rules of the common law, and, when it couches its enactment in common law language, that its intent was to continue those rules in statutory form. (*Baker* v. *Baker* (1859) 13 Cal. 87, 95-96; *Morris* v. *Oney* (1963) 217 Cal.App.2d 864, 870 [32 Cal.Rptr. 88].) This is particularly appropriate in considering the work of the first session of our Legislature: its precedents were necessarily drawn from the common law, as modified in certain respects by the Constitution and by legislation of our sister states.[3]

We therefore undertake a brief review of the origins and development of the common law of abortional homicide. (For a more detailed treatment, see Means, *The Law of New York Concerning Abortion and the Status of the Foetus, 1664–1968: A Case of Cessation of Constitutionality* (1968) 14 N.Y.L.F. 411 [hereinafter cited as Means]; Stern, *Abortion: Reform and the Law* (1968) 59 J.Crim.L., C. & P.S. 84; Quay, *Justifiable Abortion — Medical and Legal Foundations II* (1961) 49 Geo.L.J. 395.) ■ From that inquiry it appears that by the year 1850—the date with which we are concerned—an infant could not be the subject of homicide at common law *unless it had been born alive.*[4] Perhaps the most influential statement of the "born alive" rule is that of Coke, in mid-17th century: "If a woman be quick with childe,[5] and by a potion or otherwise killeth

---

the "express or implied malice" language of this provision to the following section (§ 188), and delete the second sentence as surplusage. (Code Commissioners' Note, Pen. Code of Cal. (1st ed. 1872) p. 80.)

[3]The common law meaning of a statutory term is also a proper basis for defeating a claim of fatal uncertainty. (*In re Newbern* (1960) 53 Cal.2d 786, 792 [3 Cal.Rptr. 364, 350 P.2d 116], and cases cited.)

[4]Earlier common law, possibly reflecting doctrines of medieval canon law, may have been otherwise. Thus in the 13th century Bracton wrote: "If there be anyone who strikes a pregnant woman or gives her a poison whereby he causes an abortion, if the foetus be already formed or animated, and especially if it be animated, he commits homicide." (Bracton, The Laws and Customs of England, III, ii, 4, quoted and translated in Means, at p. 419.) Sir James Stephen characterizes this passage, however, as an instance "in which Bracton carries the law as to homicide to a length which was not adopted in later times." (3 Stephen, A History of the Criminal Law of England (1883), p. 32.) There seem to be no reported cases supporting Bracton's view, and it need not further detain us.

[5]"Quickening" is said to occur when movements of the fetus are first sensed or observed, and ordinarily takes place between the 16th and 18th week of pregnancy. Although much of the history of the law of abortion and abortional homicide revolves

it in her wombe, or if a man beat her, whereby the childe dyeth in her body, and she is delivered of a dead childe, this is a great misprision [i.e., misdemeanor], and no murder; but if the childe be born alive and dyeth of the potion, battery, or other cause, this is murder; for in law it is accounted a reasonable creature, *in rerum natura,* when it is born alive." (3 Coke, Institutes *50 (1648).) In short, "By Coke's time, the common law regarded abortion as murder only if the foetus is (1) quickened, (2) born alive, (3) lives for a brief interval, and (4) then dies." (Means, at p. 420.) Whatever intrinsic defects there may have been in Coke's work (see 3 Stephen, A History of the Criminal Law of England (1883) pp. 52-60), the common law accepted his views as authoritative. In the 18th century, for example, Coke's requirement that an infant be born alive in order to be the subject of homicide was reiterated and expanded by both Blackstone[6] and Hale.[7]

Against this background, a series of infanticide prosecutions were brought in the English courts in mid-19th century. In each, a woman or her accomplice was charged with murdering a newborn child, and it was uniformly declared to be the law that a verdict of murder could not be returned unless it was proved the infant had been born alive. Thus in *Rex* v. *Brain* (1834) 6 Car. & P. 349, 350, 172 Eng.Reprint 1272, the court instructed the jury that "A child must be actually wholly in the world in a living state to be the subject of a charge of murder; but if it has been wholly born, and is alive, it is not essential that it should have breathed at the time it was killed; as many children are born alive, and yet do not breathe for some time after their birth. But you must be satisfied that the child was wholly born into the world at the time it was killed, or you ought not to find the prisoner guilty of murder." (Accord, *Rex* v. *Poulton* (1832) 5 Car. & P. 329, 172 Eng.Reprint 997; *Rex* v. *Enoch* (1833) 5 Car. & P. 539, 172 Eng.Reprint 1089; *Rex* v. *Crutchley* (1836) 7 Car. & P. 814, 173 Eng.Reprint 355; *Rex* v. *Sellis* (1836) 7 Car. & P. 850, 173 Eng.Reprint

---

around this concept, it is of no medical significance and was never adopted into the law of California.

[6]"[I]f a woman is quick with child, and by a potion or otherwise, killeth it in her womb; or if any one beat her, whereby the child dieth in her body, and she is delivered of a dead child; this, though not murder, was by the ancient law homicide or manslaughter. But the modern law doth not look upon this offence in quite so atrocious a light but merely as a heinous misdemeanor." (1 Blackstone, Commentaries *129-*130 (1765).)

[7]"If a woman be quick or great with child, if she takes, or another gives her any potion to make an abortion, or if a man strikes her, whereby the child within her is killed, it is not murder nor manslaughter by the law of England, because it is not yet *in rerum natura*. . . . But if a man procures a woman with child to destroy her infant, when born, and the child is born, and the woman in pursuance of that procurement kills the infant, this is murder. . . ." (1 Hale, Pleas of the Crown (1778), p. 433; see also 1 Hawkins, Pleas of the Crown (1762) ch. 31, § 16.)

370; *Reg.* v. *Reeves* (1839) 9 Car. & P. 25, 173 Eng.Reprint 724; *Reg.* v. *Wright* (1841) 9 Car. & P. 754, 173 Eng.Reprint 1039; *Reg.* v. *Trilloe* (1842) Car. & M. 650, 174 Eng.Reprint 674; see also cases collected in Atkinson, *Life, Birth, and Livebirth* (1904) 20 L.Q.Rev. 134, 139-145.)

Of these decisions, some pointed out that evidence of breathing is not conclusive because that function may begin before the infant is fully born (*Poulton, Enoch, Sellis*), while others observed that the infant can possess an "independent circulation"—one of the tests used to determine live birth—even though the umbilical cord may not yet be severed (*Reeves, Trilloe*). But all were in agreement that however live birth was to be proved, unless that event had occurred before the alleged criminal act there could be no conviction of homicide.

By the year 1850 this rule of the common law had long been accepted in the United States. As early as 1797 it was held that proof the child was born alive is necessary to support an indictment for murder (*State* v. *McKee* (Pa.) Addison 1), and the same rule was reiterated on the eve of the first session of our Legislature (*State* v. *Cooper* (1849) 22 N.J.L. 52). Although the precise issue in *Cooper* was whether an attempted abortion on a woman whose fetus had not yet "quickened" was a common law crime, the opinion begins by a recital of the common law rules on abortional homicide. In its argument the State took the position that attempted abortion was an offense against the person of the child, and the court replied that "the very point of inquiry is, whether that be at all an offense or not, and whether the child be *in esse,* so that any crime can be committed against its person. In regard to offences against the person of the child, a distinction is well settled between its condition before and after its birth. Thus, it is not murder to kill a child before it be born, even though it be killed in the very process of delivery." (*Id.* at p. 54.) In support of this proposition, the court then set out in full each of the passages of Coke, Blackstone, and Hale quoted hereinabove. (*Id.* at pp. 54-55.)

While it was thus "well settled" in American case law that the killing of an unborn child was not homicide, a number of state legislatures in the first half of the 19th century undertook to modify the common law in this respect.[8] The movement began when New York abandoned the common law of abortion in 1830. The revisers' notes on that legislation recognized the existing rule,[9] but nevertheless proposed a special feticide statute

---

[8] A feticide statute was enacted in England in 1929. (Infant Life (Preservation) Act, 19 & 20 Geo. 5, ch. 34.)

[9] "A child not born, is considered as not being in *rerum natura,* and therefore not the subject of murder, so that the [*sic*] killing such a child is not murder or manslaughter." (Quoted in Means, at p. 444.)

which, as enacted, provided that "The wilful killing of an unborn quick child, by any injury to the mother of such child, which would be murder if it resulted in the death of such mother, shall be deemed manslaughter in the first degree." (N.Y. Rev. Stat. 1829, pt. IV, ch. 1, tit. 2, § 8, quoted in Means, at p. 443.) At the same time the New York Legislature enacted a companion section (§ 9) which, although punishing a violaton thereof as second degree manslaughter, was in essence an "abortion law" similar to those in force in most states today.[10]

In the years between 1830 and 1850 at least five other states followed New York and enacted, as companion provisions, (1) a statute declaring feticide to be a crime, punishable as manslaughter, and (2) a statute prohibiting abortion.[11] In California, however, the pattern was not repeated. Much of the Crimes and Punishments Act of 1850 was based on existing New York statute law; but although a section proscribing abortion was included in the new Act (§ 45), the Legislature declined to adopt any provision defining and punishing a special crime of feticide.

■ We conclude that in declaring murder to be the unlawful and malicious killing of a "human being" the Legislature of 1850 intended that term to have the settled common law meaning of a person who had been born alive, and did not intend the act of feticide—as distinguished from abortion—to be an offense under the laws of California.

Nothing occurred between the years 1850 and 1872 to suggest that in adopting the new Penal Code on the latter date the Legislature entertained any different intent. The case law of our sister states, for example, remained consonant with the common law. In *Abrams* v. *Foshee* (Cole ed. 1856) 3 Iowa 274, 278, the court noted that Iowa's feticide statute (Iowa Rev. Stat. 1843, § 10) had been repealed by the Iowa Code of 1851; it was contended

---

[10]The statute declared punishable "Every person who shall administer to any woman pregnant with a quick child, any medicine, drug or substance whatever, or shall use or employ any instrument or other means, with intent thereby to destroy such child, unless the same shall have been necessary to preserve the life of such mother, or shall have been advised by two physicians to be necessary for such purpose. . . ." (Quoted in Means, at p. 447.)

[11]Mo. Rev. Stat. 1835, art. II, § § 9, 10; Ark. Rev. Stat. 1838, ch. 44, div. III, art. II, § § 5, 6; Mich. Rev. Stat. 1846, ch. 153, § § 32, 33; Miss. Code 1848, § § 8, 9; Wis. Rev. Stat. 1849, ch. 133, § § 10, 11. The texts of each of these statutes may be found in Appendix I to Quay, *Justifiable Abortion—Medical and Legal Foundations II, supra,* 49 Geo.L.J. 395, 447 et seq., from which this compendium is drawn. The relevance of these statutes to the issue before us is underscored by the view recently voiced that "their target is probably the person who intends to cause a pregnant woman to abort without her consent and who uses physical violence against her body to achieve the purpose." (George, *Current Abortion Laws: Proposals and Movements for Reform,* in Abortion and the Law (Smith ed. 1967) at p. 11.)

that an unborn child is nevertheless "a *human being,* within the meaning of [Iowa Code] section 2508, which provides that whoever kills any human being, with malice aforethought, either express or implied, is guilty of murder." The court observed that "notwithstanding the infant in *ventre sa mere,* is treated by the law for some purposes, as born, or as a human being, yet we are not aware that it has been so treated, so far as to make the act of its miscarriage *murder,* unless so declared by statute. . . . When the child is born, however, it becomes a human being, within the meaning of the law; and if it shall then die, by reason of any potions or bruises it received in the womb, it would be murder in those who administered or gave them, with a view of causing the miscarriage." (*Ibid.*) Citing Blackstone, Coke, and other authorities, the court concluded that "an infant in *ventre sa mere,* is not a human being within the meaning of" the statute defining murder. (*Id.* at p. 279.)[12]

Any lingering doubt on this subject must be laid to rest by a consideration of the legislative history of the Penal Code of 1872. The Act establishing the California Code Commission (Stats. 1870, ch. 516, § 2, p. 774) required the commissioners to revise all statutes then in force, correct errors and omissions, and "recommend all such enactments as shall, in the judgment of the Commission, be necessary to supply the defects of and give completeness to the existing legislation of the State. . . ." In discharging this duty the statutory schemes of our sister states were carefully examined,[13] and we must assume the commissioners had knowl-

---

[12]Accord, *Commonwealth* v. *O'Donohue* (Pa. 1871) 8 Phila. 623. Although it was decided shortly after the Penal Code of 1872 was approved, mention should also be made of the leading case of *Evans* v. *People* (1872) 49 N.Y. 86. In a state which had had a feticide statute on the books for 42 years, the New York Court of Appeal firmly restricted that measure to its terms and turned to the common law for its construction. The court first observed that "Causing the death of an infant in the mother's womb was at a very early day deemed murder; but is not so regarded at the common law at the present time, and is not made so by statute. Such an infant is not considered a person or a human being, upon whom the crime of murder can be committed. . . . The willful killing of an unborn child is not manslaughter, except as rendered so by statute." (*Id.* at p. 88.) Insisting on the common law meaning of the word "quick" in the New York feticide statute, the court concluded: "Death is the opposite of life; it is the termination of life, and death cannot be caused when there is no life. There must be a living child before its death can be produced. It is not the destruction of the foetus, the interruption of that process by which the human race is propagated and continued, that is punished by the statute as manslaughter, but it is the causing the death of a living child." (*Id.* at p. 90.)

[13]The report of the advisory committee to the Code Commission stated that its members "have made a careful and critical examination of the Penal Code prepared by the Revision Commission. In doing so they have compared it, section by section, with our existing laws, and also with the Criminal Codes of some of the most populous States. In the performance of this labor they have constantly consulted with the Commissioners and suggested such amendments as they deemed advisable." (Quoted in Preface, Pen. Code of Cal. (1st ed. 1872) at pp. v-vi.)

edge of the feticide laws noted hereinabove.[14] Yet the commissioners proposed no such law for California, and none has been adopted to this day.

That such an omission was not an oversight clearly appears, moreover, from the commissioners' explanatory notes to Penal Code section 187. After quoting the definitions of murder given by Coke, Blackstone, and Hawkins, the commissioners conclude: "A child within its mother's womb is not a 'human being' within the meaning of that term as used in defining murder. The rule is that it must be born.—*Rex* vs. *Brain*, 6 Car. & P., p. 349. That every part of it must have come from the mother before the killing of it will constitute a felonious homicide.—*Rex* vs. *Brain*, 6 Car. & P., p. 349; *Rex* vs. *Crutchley*, 7 Car. & P., p. 814; *Rex* vs. *Sellis*, 7 Car. & P., p. 850; *Rex* vs. *Poulton*, 5 Car. & P., p. 329; 2 Bishop's Cr. Law, Secs. 541, 542." (Code Commissioners' Note, Pen. Code of Cal. (1st ed. 1872), p. 81.) The cited cases, of course, are among those we have discussed earlier as representing the settled common law rule that live birth is a prerequisite to a conviction of homicide.

█ When there is persuasive evidence of a legislative intent contrary to the views expressed in code commissioners' notes, those views will not be followed in construing the statute. (See, e.g., *People* v. *Valentine* (1946) 28 Cal.2d 121, 138, 142-144 [169 P.2d 1] [contrary to commissioners' note, Legislature omitted important limitation of prior statute in codifying manslaughter provision of Penal Code].) Here, however, the views of the commissioners are in full accord with the history of section 187; and as we have seen, the Legislature made no significant change in that statute when it was codified into the Penal Code. █ The rule is therefore applicable that "Reports of commissions which have proposed statutes that are subsequently adopted are entitled to substantial weight in construing the statutes. [Citations.] This is particularly true where the statute proposed by the commission is adopted by the Legislature without any change whatsoever and where the commission's comment is brief, because in such a situation there is ordinarily strong reason to believe that the legislators' votes were based in large measure upon the explanation of the commission proposing the bill." (*Van Arsdale* v. *Hollinger* (1968) 68 Cal.2d 245, 249-250 [66 Cal.Rptr. 20, 437 P.2d 508].)[15]

[14]Footnote 11, *ante,* and accompanying text. In addition, similar statutes had since been enacted in three more jurisdictions. (Minn. (Terr.) Rev. Stat. 1851, ch. 100, §§ 10, 11; Kan. (Terr.) Stat. 1855, ch. 48, §§ 9, 10; Fla. Acts 1st Sess. 1868, ch. 1637, III, §§ 10, 11.)

[15]In particular, this court has on a number of occasions given effect to the notes of the Code Commission of 1870-1872. (*People* v. *Stuart* (1956) 47 Cal.2d 167, 175-176 [302 P.2d 5, 55 A.L.R.2d 705]; *Baranov* v. *Scudder* (1918) 177 Cal. 458, 465 [170 P. 1122]; *O'Hara* v. *Wattson* (1916) 172 Cal. 525, 534-535 [157 P. 608]; *Bettencourt* v. *Sheehy* (1910) 157 Cal. 698, 701-702 [109 P. 89].)

■ It is the policy of this state to construe a penal statute as favorably to the defendant as its language and the circumstances of its application may reasonably permit; just as in the case of a question of fact, the defendant is entitled to the benefit of every reasonable doubt as to the true interpretation of words or the construction of language used in a statute. (*Walsh* v. *Department of Alcoholic Bev. Control* (1963) 59 Cal.2d 757, 764-765 [31 Cal.Rptr. 297, 382 P.2d 337], and cases cited.) ■ We hold that in adopting the definition of murder in Penal Code section 187 the Legislature intended to exclude from its reach the act of killing an unborn fetus.

## II

■ The People urge, however, that the sciences of obstetrics and pediatrics have greatly progressed since 1872, to the point where with proper medical care a normally developed fetus prematurely born at 28 weeks or more has an excellent chance of survival, i.e., is "viable"; that the common law requirement of live birth to prove the fetus had become a "human being" who may be the victim of murder is no longer in accord with scientific fact, since an unborn but viable fetus is now fully capable of independent life; and that one who unlawfully and maliciously terminates such a life should therefore be liable to prosecution for murder under section 187. We may grant the premises of this argument; indeed, we neither deny nor denigrate the vast progress of medicine in the century since the enactment of the Penal Code. But we cannot join in the conclusion sought to be deduced: we cannot hold this petitioner to answer for murder by reason of his alleged act of killing an unborn—even though viable—fetus. To such a charge there are two insuperable obstacles, one "jurisdictional" and the other constitutional.

Penal Code section 6 declares in relevant part that "No act or omission" accomplished after the code has taken effect "is criminal or punishable, except as prescribed or authorized by this code, or by some of the statutes which it specifies as continuing in force and as not affected by its provisions, or by some ordinance, municipal, county, or township regulation. . . ." ■ This section embodies a fundamental principle of our tripartite form of government, i.e., that subject to the constitutional prohibition against cruel and unusual punishment, the power to define crimes and fix penalties is vested exclusively in the legislative branch. (*People v. Knowles* (1950) 35 Cal.2d 175, 181 [217 P.2d 1]; *Harbor Comrs.* v. *Excelsior Redwood Co.* (1891) 88 Cal. 491, 493 [26 P. 375]; *People v. Hess* (1951) 104 Cal.App.2d 642, 685 [234 P.2d 65]; *In re Finley* (1905) 1 Cal.App. 198, 201 [81 P. 1041].) ■ Stated differently, there are no common law crimes in California. (*People* v. *Redmond* (1966) 246

Cal.App.2d 852, 862 [55 Cal.Rptr. 195]; *People* v. *Harris* (1961) 191 Cal.App.2d 754, 758 [12 Cal.Rptr. 916]; *In re Harder* (1935) 9 Cal.App. 2d 153, 155 [49 P.2d 304].) "In this state the common law is of no effect so far as the specification of what acts or conduct shall constitute a crime is concerned. [Citations.] ▉ In order that a public offense be committed, some statute, ordinance or regulation prior in time to the commission of the act, must denounce it; likewise with excuses or justifications— if no statutory excuse or justification apply as to the commission of the particular offense, neither the common law nor the so-called 'unwritten law' may legally supply it." (*People* v. *Whipple* (1929) 100 Cal.App. 261, 262 [279 P. 1008].)

Settled rules of construction implement this principle. ▉ Although the Penal Code commands us to construe its provisions "according to the fair import of their terms, with a view to effect its objects and to promote justice" (Pen. Code, § 4), it is clear the courts cannot go so far as to create an offense by enlarging a statute, by inserting or deleting words, or by giving the terms used false or unusual meanings. (*People* v. *Baker* (1968) 69 Cal.2d 44, 50 [69 Cal.Rptr. 595, 442 P.2d 675].) Penal statutes will not be made to reach beyond their plain intent; they include only those offenses coming clearly within the import of their language. (*De Mille* v. *American Fed. of Radio Artists* (1947) 31 Cal.2d 139, 156 [187 P.2d 769, 175 A.L.R. 382].) Indeed, "Constructive crimes— crimes built up by courts with the aid of inference, implication, and strained interpretation—are repugnant to the spirit and letter of English and American criminal law." (*Ex parte McNulty* (1888) 77 Cal. 164, 168 [19 P. 237].)

▉ Applying these rules to the case at bar, we would undoubtedly act in excess of the judicial power if we were to adopt the People's proposed construction of section 187. As we have shown, the Legislature has defined the crime of murder in California to apply only to the unlawful and malicious killing of one who has been born alive. We recognize that the killing of an unborn but viable fetus may be deemed by some to be an offense of similar nature and gravity; but as Chief Justice Marshall warned long ago, "It would be dangerous, indeed, to carry the principle, that a case which is within the reason or mischief of a statute, is within its provisions, so far as to punish a crime not enumerated in the statute, because it is of equal atrocity, or of kindred character, with those which are enumerated." (*United States* v. *Wiltberger* (1820) 18 U.S. (5 Wheat.) 76, 96 [5 L.Ed. 37, 42].) Whether to thus extend liability for murder in California is a determination solely within the province of the Legisla-

ture.[16] For a court to simply declare, by judicial fiat, that the time has now come to prosecute under section 187 one who kills an unborn but viable fetus would indeed be to rewrite the statute under the guise of construing it. Nor does a need to fill an asserted "gap" in the law between abortion and homicide—as will appear, no such gap in fact exists—justfy judicial legislation of this nature: to make it "a judicial function 'to explore such new fields of crime as they may appear from time to time' is wholly foreign to the American concept of criminal justice" and "raises very serious questions concerning the principle of separation of powers." (*In re Davis* (1966) 242 Cal.App.2d 645, 655-656 & fn. 12 [51 Cal.Rptr. 702].)

The second obstacle to the proposed judicial enlargement of section 187 is the guarantee of due process of law. Assuming *arguendo* that we have the power to adopt the new construction of this statute as the law of California, such a ruling, by constitutional command, could operate only prospectively, and thus could not in any event reach the conduct of petitioner on February 23, 1969.

The first essential of due process is fair warning of the act which is made punishable as a crime. "That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties, is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law." (*Connally* v. *General Constr. Co.* (1926) 269 U.S. 385, 391 [70 L.Ed. 322, 328, 46 S.Ct. 126].) "No one

---

[16]We intimate no view whatever on the advisability of such action. It is a matter of historical record, however, that the feticide statutes discussed herein (fns. 11 & 14, *ante*) all date from the middle of the 19th century; that no such legislation has been adopted in the United States in recent years; and that a number of states formerly with feticide statutes in force have declined to reenact them in revising or codifying their laws (e.g., Iowa, Minnesota, New Mexico, New York, and Wisconsin).

Indeed, in the latter two jurisdictions the legislatures left no doubt as to their intent in this regard. The draftsmen of the revised New York criminal code redefined the offense of feticide and proposed to reduce its penalty from manslaughter to a "class D felony." (Proposed New York Penal Law (1964), § 130.45 ("Killing an unborn child").) The legislature, however, deleted the offense entirely, while increasing the penalty for abortion performed after 24 weeks (N.Y. Pen. Law, § 125.45); apparently to ensure that feticide would no longer be punished as homicide, the legislature also provided that " 'Person,' when referring to the victim of a homicide, means a human being who has been born and is alive" (§ 125.05, subd. 1). Similarly, Wisconsin abandoned its 1849 feticide statute in favor of an abortion law bearing heavier penalties in the case of an "unborn quick child." (Wis. Stat. Ann. 1958, § 940.04.) The legislature defined "unborn child," as used in the *abortion* statute, as "a human being from the time of conception until it is born alive" (§ 940.04, subd. (6)), but elsewhere was careful to provide that " 'Human being' when used in the *homicide* sections means one who has been born alive" (italics added; § 939.22, cl. 16). As no feticide statute has ever been adopted in California, the absence of a specific definition of "human being" in our Penal Code is not surprising.

may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids." (*Lanzetta* v. *New Jersey* (1939) 306 U.S. 451, 453 [83 L.Ed. 888, 890, 59 S.Ct. 618].) The law of California is in full accord. (*In re Newbern, supra,* 53 Cal.2d 786, 792; *In re Davis, supra,* 242 Cal.App.2d 645, 650-651.)

■ This requirement of fair warning is reflected in the constitutional prohibition against the enactment of ex post facto laws (U.S. Const., art. I, §§ 9, 10; Cal. Const., art. I, § 16). When a new penal statute is applied retrospectively to make punishable an act which was not criminal at the time it was performed, the defendant has been given no advance notice consistent with due process. And precisely the same effect occurs when such an act is made punishable under a preexisting statute but by means of an unforeseeable *judicial* enlargement thereof. (*Bouie* v. *City of Columbia* (1964) 378 U.S. 347 [12 L.Ed.2d 894, 84 S.Ct. 1697].)

In *Bouie* two Negroes took seats in the restaurant section of a South Carolina drugstore; no notices were posted restricting the area to whites only. When the defendants refused to leave upon demand, they were arrested and convicted of violating a criminal trespass statute which prohibited entry on the property of another "after notice" forbidding such conduct. Prior South Carolina decisions had emphasized the necessity of proving such notice to support a conviction under the statute. The South Carolina Supreme Court nevertheless affirmed the convictions, construing the statute to prohibit not only the act of entering after notice not to do so but also the wholly different act of remaining on the property after receiving notice to leave.

The United States Supreme Court reversed the convictions, holding that the South Carolina court's ruling was "unforeseeable" and when an "unforeseeable state-court construction of a criminal statute is applied retroactively to subject a person to criminal liability for past conduct, the effect is to deprive him of due process of law in the sense of fair warning that his contemplated conduct constitutes a crime." (378 U.S. at pp. 354-355 [12 L.Ed.2d at p. 900].) Analogizing to the prohibition against retrospective penal legislation, the high court reasoned "Indeed, an unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an *ex post facto* law, such as Art. I, § 10, of the Constitution forbids. An *ex post facto* law has been defined by this Court as one 'that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action,' or 'that *aggravates* a *crime,* or makes it *greater* than it was, when committed.' *Calder* v. *Bull,* 3 Dall. 386, 390, 1 L.Ed. 648, 650. If a state legislature is barred by the

*Ex Post Facto* Clause from passing such a law, it must follow that a State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction. Cf. *Smith* v. *Cahoon,* 283 U.S. 553, 565, 75 L.Ed. 1264, 1273, 51 S.Ct. 582. The fundamental principle that 'the required criminal law must have existed when the conduct in issue occurred,' Hall, General Principles of Criminal Law (2d ed. 1960), at 58-59, must apply to bar retroactive criminal prohibitions emanating from courts as well as from legislatures. If a judicial construction of a criminal statute is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue,' it must not be given retroactive effect. *Id.,* at 61." (Fn. omitted.) (*Id.* at pp. 353-354 [12 L.Ed.2d at pp. 899-900].)

The court remarked in conclusion that "Application of this rule is particularly compelling where, as here, the petitioners' conduct cannot be deemed improper or immoral." (*Id.* at p. 362 [12 L.Ed.2d at p. 905].) In the case at bar the conduct with which petitioner is charged is certainly "improper" and "immoral," and it is not contended he was exercising a constitutionally favored right. ■ But the matter is simply one of degree, and it cannot be denied that the guarantee of due process extends to violent as well as peaceful men. The issue remains, would the judicial enlargement of section 187 now proposed have been foreseeable to this petitioner?

It is true that section 187, on its face, is not as "narrow and precise" as the South Carolina statute involved in *Bouie;* on the other hand, neither is it as vague as the statutes struck down in *Connally* and *Lanzetta.*[17] Rather, section 187 bears a plain, common sense meaning, well settled in the common law and fortified by its legislative history in California. In *Bouie,* moreover, the court stressed that a breach of the peace statute was also in force in South Carolina at the time of the events, and that the defendants were in fact arrested on that ground and prosecuted (but not convicted) for that offense. ■ Here, too, there was another statute on the books which petitioner could well have believed he was violating: Penal Code section 274 defines the crime of abortion, in relevant part, as the act of "Every person who . . . uses or employs any instrument *or any other means whatever,* with intent thereby to procure the miscarriage" of any woman, and does not come within the exceptions provided by law. ■ The gist of the crime is the performance, with the requisite intent, of any of the acts enumerated in the statute. (*People* v. *Root* (1966) 246 Cal.App.2d 600, 604 [55 Cal.Rptr. 89]; *People* v. *Moore* (1963) 213 Cal.App.2d 160, 167 [23 Cal.Rptr. 502].) It is therefore no defense to a

---

[17]*Connally* v. *General Constr. Co., supra,* 269 U.S. 385 [statute requiring minimum wage at "current" rate in the "locality"]; *Lanzetta* v. *New Jersey, supra,* 306 U.S. 451 [statute prohibiting membership in a "gang"].

charge of violating section 274 that the act was committed unusually late in the woman's pregnancy or by a method not commonly employed for that purpose. The prohibition is against "any means which might be used to effect a miscarriage" (*People* v. *Clapp* (1944) 67 Cal.App.2d 197, 202 [153 P.2d 758]), and has been applied to instances of beating or other physical violence inflicted upon the person of the woman for this purpose.[18] ▓ In the present case, it will be remembered, petitioner's avowed goal was not primarily to kill the fetus while it was inside his wife's body, but rather to "stomp it out of" her; although one presumably cannot be done without the other, petitioner's choice of words is significant and strongly implies an "intent thereby to procure the miscarriage" of his wife in violation of section 274.

Turning to the case law, we find no reported decision of the California courts which should have given petitioner notice that the killing of an unborn but viable fetus was prohibited by section 187. Indeed, the contrary clearly appears from *People* v. *Eldridge* (1906) 3 Cal.App. 648, 649 [86 P. 832], in which the defendant challenged as uncertain an information which charged him with the murder of "a human being," to wit, the infant child "born to the said Glover H. Eldridge and said Mabel Eldridge on or about said twentieth day of February, 1905." It was urged that "such charge might include the killing before birth, and therefore it cannot be determined from the information whether murder or abortion was intended to be charged." The Court of Appeal rejected the contention, observing that "The only reasonable construction which can be given to the language employed in the information is to say that it charges that a child born to the defendant was by him unlawfully killed and murdered. That it was born is clearly stated; that it could be killed after birth of necessity implies that *it was born alive,* and we think the charge of murder was set forth with the degree of certainty required." (Italics added.)

Properly understood, the often cited case of *People* v. *Chavez* (1947) 77 Cal.App.2d 621 [176 P.2d 92], does not derogate from this rule. There the defendant was charged with the murder of her newborn child, and convicted of manslaughter. She testified that the baby dropped from her womb into the toilet bowl; that she picked it up two or three minutes later, and cut but did not tie the umbilical cord; that the baby was limp and made no cry; and that after 15 minutes she wrapped it in a newspaper and concealed it, where it was found dead the next day. The autopsy surgeon testified that the baby was a full-term, nine-month child, weighing six and one-half pounds and appearing normal in every respect; that the

---

[18]See 1 C.J.S., Abortion, section 5c; Means, at page 444, refers to "abortion by blows" as "a technique formerly much favored by ignorant midwives."

body had very little blood in it, indicating the child had bled to death through the untied umbilical cord; that such a process would have taken about an hour; and that in his opinion "the child was born alive, based on conditions he found and the fact that the lungs contained air and the blood was extravasated or pushed back into the tissues, indicating heart action." (*Id.* at p. 623.)

On appeal, the defendant emphasized that a doctor called by the defense had suggested other tests which the autopsy surgeon could have performed to determine the matter of live birth; on this basis, it was contended that the question of whether the infant was born alive "rests entirely on pure speculation." (*Id.* at p. 624.) The Court of Appeal found only an insignificant conflict in that regard (*id.* at p. 627), and focussed its attention instead on testimony of the autopsy surgeon admitting the possibility that the evidence of heart and lung action could have resulted from the child's breathing "after presentation of the head but before the birth was completed" (*id.* at p. 624).

The court cited the mid-19th century English infanticide cases mentioned hereinabove, and noted that the decisions had not reached uniformity on whether breathing, heart action, severance of the umbilical cord, or some combination of these or other factors established the status of "human being" for the purposes of the law of homicide. (*Id.* at pp. 624-625.) The court then adverted to the state of modern medical knowledge, discussed the phenomenon of viability, and held that "a viable child *in the process of being born* is a human being within the meeting of the homicide statutes, whether or not the process has been fully completed. It should at least be considered a human being where it is a living baby and where in the natural course of events *a birth which is already started* would naturally be successfully completed." (Italics added.) (*Id.* at p. 626.) Since the testimony of the autopsy surgeon left no doubt in that case that a live birth had at least begun, the court found "the evidence is sufficient here to support the implied finding of the jury that this child *was born alive and became a human being within the meaning of the homicide statutes.*" (Italics added.) (*Id.* at p. 627.)[19]

*Chavez* thus stands for the proposition—to which we adhere—that a viable fetus "in the process of being born" is a human being within the meaning of the homicide statutes. But it stands for no more; in particular it does not hold that a fetus, however viable, which is *not* "in the process of being born" is nevertheless a "human being" in the law of homicide. On the contrary, the opinion is replete with references to the

---

[19]Penal Code section 192, which the defendant in *Chavez* was convicted of violating, defines manslaughter as "the unlawful killing of a human being, without malice."

common law requirement that the child be "born alive," however that term as defined, and must accordingly be deemed to reaffirm that requirement as part of the law of California.[20]

The *Chavez* court relied in part on *Scott* v. *McPheeters* (1939) 33 Cal.App.2d 629 [92 P.2d 678, 93 P.2d 562], a decision holding that an unborn child is an "existing person," within the meaning of Civil Code section 29, for the purpose of bringing a postnatal action for prenatal injuries. In *People* v. *Belous, supra,* 71 Cal.2d 954, however, a majority of this court distinguished such civil law rules on the ground they either "require a live birth or reflect the interest of the parents." (*Id.* at p. 968 & fn. 12.) We need not repeat that analysis here; but two further bases of distinction deserve mention. First, *Scott* emphasized that the child's right of action for prenatal injuries was unknown to the common law and would not exist in California but for statutory authorization.[21] By the same token, as we have seen, the fetus' status as a "human being" within the definition of murder was unknown to the common law and exists only where special feticide statutes have been enacted. Secondly, the law's protection of the *property* interests of an unborn child dates not from *Scott* but from a far earlier time: for example, in Blackstone's day it was already well settled that "An infant *in ventre sa mere,* or in the mother's womb, is supposed in law to be born for many purposes. It is capable of having a guardian assigned to it; and it is enabled to have an estate limited to its use, and to take afterwards by such limitation, as if it were then

---

[20] In *People* v. *Belous* (1969) 71 Cal.2d 954, 968-969 [80 Cal.Rptr. 354, 458 P.2d 194], a majority of this court recognized "there are major and decisive areas where the embryo and fetus are not treated as equivalent to the born child. . . . The intentional destruction of the born child is murder or manslaughter. The intentional destruction of the embryo or fetus is never treated as murder, and only rarely as manslaughter but rather as the lesser offense of abortion." While the case was decided after the occurrence of the acts with which petitioner is charged, it nonetheless indicates that *Chavez* did not change California law on this point. Indeed, in footnote 13 we proceeded to distinguish *Chavez* as a case holding that "for purposes of the manslaughter and murder statutes, human life may exist where childbirth has commenced but has not been fully completed." (Accord, Perkins on Criminal Law (2d ed. 1969), p. 30.) In the case at bar, of course, the record is devoid of evidence that "childbirth" had commenced at the time of the acts charged.

[21] "At common law, the weight of authority holds that an unborn child, in contemplation of law, has no existence as a human being separate from its mother, and that it therefore has no right of action for personal injuries inflicted upon it prior to its birth, by the wrongful conduct of another. Section 29 of the Civil Code is diametrically opposed to that theory, for it declares that for certain specified purposes the unborn child shall be deemed to be *an existing person.*" (33 Cal.App.2d at pp. 632-633.) The court then held this right of action to be among the "specified purposes" of the statute.

actually born." (1 Blackstone, Commentaries *130 (1765).) Inasmuch as such rules coexisted for centuries with the common law requirement of live birth to support a conviction of homicide, they cannot reasonably be deemed to have given petitioner notice that the killing of an unborn but viable fetus would now be murder.

Finally, although a defendant is not bound to know the decisional law of other states, the United States Supreme Court in *Bouie* (378 U.S. at pp. 360-361 [12 L.Ed.2d at pp. 903-904]) referred to reported cases of jurisdictions other than South Carolina in concluding that the South Carolina Supreme Court's construction of the statute "is no less inconsistent with the law of other States than it is with the prior case law of South Carolina and, of course, with the language of the statute itself." Here, too, the cases decided in our sister states from *Chavez* to the present are unanimous in requiring proof that the child was born alive before a charge of homicide can be sustained. (*Bennett* v. *State* (Wyo. 1963) 377 P.2d 634, 635-637; *People* v. *Ryan* (1956) 91 Ill.2d 467 [138 N.E.2d 516, 518-520]; *People* v. *Hayner* (1949) 300 N.Y. 171 [90 N.E.2d 23, 24]; *Singleton* v. *State* (1948) 33 Ala.App. 536 [35 So.2d 375, 378]; *Montgomery* v. *State* (1947) 202 Ga. 678 [44 S.E.2d 242, 243-244]; cf. *Watson* v. *State* (1955) 208 Md. 210 [117 A.2d 549, 552].) And the text writers of the same period are no less unanimous on the point. (Perkins on Criminal Law, *supra,* pp. 29-30; Clark & Marshall, Crimes (6th ed. 1958) § 10.00, pp. 534-536; 1 Wharton, Criminal Law and Procedure (Anderson ed. 1957) § 189; 2 Burdick, Law of Crime (1946) § 445; 40 Am.Jur.2d, Homicide, §§ 9, 434; 40 C.J.S., Homicide, § 2b.)

■ We conclude that the judicial enlargement of section 187 now urged upon us by the People would not have been forseeable to this petitioner, and hence that its adoption at this time would deny him due process of law.

Let a peremptory writ of prohibition issue restraining respondent court from taking any further proceedings on Count I of the information, charging petitioner with the crime of murder.

McComb, J., Peters, J., Tobriner, J., and Peek, J.,* concurred.

**BURKE, Acting C. J.**—The majority hold that "Baby Girl" Vogt, who, according to medical testimony, had reached the 35th week of development,

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Acting Chairman of the Judicial Council.

had a 96 percent chance of survival, and was "definitely" alive and viable at the time of her death, nevertheless was not a "human being" under California's homicide statutes. In my view, in so holding, the majority ignore significant common law precedents, frustrate the express intent of the Legislature, and defy reason, logic and common sense.

Penal Code section 187 defines murder as "the unlawful killing of a human being, with malice aforethought." Penal Code section 192 defines manslaughter as "the unlawful killing of a human being, without malice." The majority pursue the meaning of the term "human being" down the ancient hallways of the common law, citing Coke, Blackstone and Hale to the effect that the slaying of a "quickened" (i.e. stirring in the womb) child constituted "a great misprision," but not murder. Although, as discussed below, I strongly disagree with the premise that the words of our penal statutes must be construed as of 1648 or 1765, nevertheless, there is much common law precedent which would support the view that a viable fetus such as Baby Girl Vogt is a human being under those statutes.

The majority cast a passing glance at the common law concept of quickening, but fail to explain the significance of that concept: At common law, the quickened fetus *was* considered to be a human being, a second life separate and apart from its mother. As stated by Blackstone, in the passage immediately preceding that portion quoted in the majority opinion (fn. 6), "Life is the immediate gift of God, a right inherent by nature in every individual; *and it begins in contemplation of law as soon as an infant is able to stir in the mother's womb.*" (Italics added; 1 Blackstone, Commentaries, p. 129; see *Rex* v. *Anonymous* (1811) 3 Campb. 73, 170 Eng.Reprint 1310, 1311-1312; *State* v. *Cooper,* 22 N.J.L. 52, 54-55.)

Modern scholars have confirmed this aspect of common law jurisprudence. As Means observes, "The common law itself prohibited abortion after quickening and hanging a pregnant felon after quickening, *because the life of a second human being would thereby be taken,* although it did not call the offense murder or manslaughter." (Italics added; Means, *The Law of New York Concerning Abortion and the Status of the Foetus, 1664-1968: A Case of Cessation of Constitutionality* (1968) 14 N.Y.L.F. 411, 504.)

This reasoning explains why the killing of a quickened child was considered "a great misprision," although the killing of an unquickened child was no crime at all at common law (Means, *supra,* at p. 420). Moreover, although the common law did not apply the labels of "murder" or "manslaughter" to the killing of a quickened fetus, it appears that at common law this "great misprision" was severely punished. As late as 1837, the wilful

aborting of a woman quick with child was punishable by *death* in England. (Lord Landsdowne's Act of 1828 (9 Geo. IV, c. 31; Lord Ellenborough's Act of 1803 (43 Geo. III, c. 58);[1] see Means, *supra,* at p. 440, fn. 64.)

Thus, at common law, the killing of a quickened child was severely punished, since that child was considered to be a human being. The majority would have us assume that the Legislature in 1850 and 1872 simply overlooked this "great misprision" in codifying and classifying criminal offenses in California, or reduced that offense to the lesser offense of illegal abortion with its relatively lenient penalties (Pen. Code, § 274).[2]

In my view, we cannot assume that the Legislature intended a person such as defendant, charged with the malicious slaying of a fully viable child, to suffer only the mild penalties imposed upon common abortionists who, ordinarily, procure only the miscarriage of a nonviable fetus or embryo. (See Comment, Model Penal Code, § 207.11, p. 149 (Tent. Draft No. 9, 1959).) To do so would completely ignore the important common law distinction between the quickened and unquickened child.

Of course, I do not suggest that we should interpret the term "human being" in our homicide statutes in terms of the common law concept of quickening. At one time, that concept had a value in differentiating, as accurately as was then scientifically possible, between life and nonlife. The analogous concept of viability is clearly more satisfactory, for it has a well defined and medically determinable meaning denoting the ability of the fetus to live or survive apart from its mother.[3]

The majority opinion suggests that we are confined to common law concepts, and to the common law definition of murder or manslaughter. However, the Legislature, in Penal Code sections 187 and 192, has defined those offenses for us: homicide is the unlawful killing of a "human being." Those words need not be frozen in place as of any particular time, but must be fairly and reasonably interpreted by this court to promote justice and to carry out the evident purposes of the Legislature in adopting a homicide statute. Thus, Penal Code section 4, which was enacted in 1872 along with sections 187 and 192, provides: "The rule of the common law, that penal statutes are to be strictly construed, has no application to this code.

---

[1]These statutes are as much the "common law" of England as the subsequently decided English decisions cited by the majority. (*People* v. *Baker,* 69 Cal.2d 44, 48-49 [69 Cal.Rptr. 595, 442 P.2d 675].)

[2]Section 274, adopted in 1872, was based upon substantially identical language in 1850 Statutes, chapter 99, section 45, page 233. These sections imposed a prison term of from two to five years for procuring a miscarriage.

[3]Schmidt, Attorneys' Dictionary of Medicine, 870; see *People* v. *Chavez,* 77 Cal.App.2d 621, 625-626 [176 P.2d 92].

All its provisions are to be construed according to the fair import of their terms, with a view to effect its objects and to promote justice." (Accord, *In re Cregler,* 56 Cal.2d 308, 312 [14 Cal.Rptr. 289, 363 P.2d 305]; *People* v. *Valentine,* 28 Cal.2d 121, 142 [169 P.2d 1]; *In re Haines,* 195 Cal. 605, 614, 621 [234 P. 883].)

As the majority opinion recognizes, " 'In this state the common law is of no effect so far as the specification of what acts or conduct shall constitute a crime is concerned.' " (*Ante,* p. 632, quoting from *People* v. *Whipple,* 100 Cal.App. 261, 262 [279 P. 1008].) Instead, we must construe penal statutes in accordance with the "fair import" of their terms, rather than restrict those statutes to common law principles. As stated in *Katz* v. *Walkinshaw,* 141 Cal. 116, 122-123 [70 P. 663, 74 P. 766], "The idea that the doctrine . . . is a part of the common law adopted by our statute, and beyond the power of the court to change or modify, is founded upon a misconception of the extent to which the common law is adopted by such statutory provisions, and a failure to observe some of the rules and principles of the common law itself. . . . The true doctrine is, that the common law by its own principles adapts itself to varying conditions, and modifies its own rules so as to serve the ends of justice under the different circumstances, a principle adopted into our code by section 3510 of the Civil Code: 'When the reason of a rule ceases, so should the rule itself.' "

Penal Code section 4, which abolishes the common law principle of the strict construction of penal statutes, embodies the doctrine of *Katz* v. *Walkinshaw, supra,* 141 Cal. 116, and permits this court fairly to construe the terms of those statutes to serve the ends of justice. Consequently, nothing should prevent this court from holding that Baby Girl Vogt was a human ("belonging or relating to man; characteristic of man").[4] being ("existence, as opp. to nonexistence; specif. life")[5] under California's homicide statutes.

We commonly conceive of human existence as a spectrum stretching from birth to death. However, if this court properly might expand the definition of "human being" at one end of that spectrum, we may do so at the other end. Consider the following example: All would agree that "Shooting or otherwise damaging a corpse is not homicide . . . ." (Perkins, Criminal Law (2d ed. 1969) ch. 2, § 1, p. 31.) In other words, a corpse is not considered to be a "human being" and thus cannot be the subject of a "killing" as those terms are used in homicide statutes. However, it is readily apparent that our concepts of what constitutes a "corpse"

---

[4]Webster's New International Dictionary (2d ed. 1939), page 1211, column 3.
[5]*Ibid,* at page 247, column 2.

have been and are being continually modified by advances in the field of medicine, including new techniques for life revival, restoration and resuscitation such as artificial respiration, open heart massage, transfusions, transplants and a variety of life-restoring stimulants, drugs and new surgical methods. Would this court ignore these developments and exonerate the killer of an apparently "drowned" child merely because that child would have been pronounced dead in 1648 or 1850? Obviously not. Whether a homicide occurred in that case would be determined by medical testimony regarding the capability of the child to have survived prior to the defendant's act. And that is precisely the test which this court should adopt in the instant case.

The common law reluctance to characterize the killing of a quickened fetus as a homicide was based solely upon a presumption that the fetus would have been born dead. (*People* v. *Chavez, supra,* 77 Cal.App.2d 621, 626; Atknson, *Life, Birth and Livebirth,* 20 L.Q.Rev. 134.) This presumption seems to have persisted in this country at least as late as 1876. (See *State* v. *Winthrop,* 43 Iowa 519, 523.) Based upon the state of the medical art in the 17th, 18th and 19th centuries, that presumption may have been well-founded. However, as we approach the 21st century, it has become apparent that "This presumption is not only contrary to common experience and the ordinary course of nature, but it is contrary to the usual rule with respect to presumptions followed in this state." (*People* v. *Chavez, supra,* at p. 626; see Civ. Code, § 3546 [formerly Code Civ. Proc., § 1963, subd. 28]; cf. Health & Saf. Code, § 25953, forbidding therapeutic abortion after the 20th week of pregnancy.)

There are no accurate statistics disclosing fetal death rates in "common law England," although the foregoing presumption of death indicates a significantly high death experience. On the other hand, in California the fetal death rate[6] in 1968 is estimated to be 12 deaths in 1,000, a ratio which would have given Baby Girl Vogt a 98.8 percent chance of survival. (Cal. Statistical Abstract (1969) Table E-3, p. 65.) If, as I have contended, the term "human being" in our homicide statutes is a fluid concept to be defined in accordance with present conditions, then there can be no question that the term should include the fully viable fetus.

The majority suggest that to do so would improperly create some new offense. However, the offense of murder is no new offense. Contrary to the majority opinion, the Legislature has not "defined the crime of murder in California to apply only to the unlawful and malicious killing of one who has been born alive." (*Ante,* p. 632.) Instead, the Legislature simply used the broad term "human being" and directed the courts to construe

---

[6]I.e., fetal deaths of 20 weeks or more gestation.

that term according to its "fair import" with a view to effect the objects of the homicide statutes and promote justice. (Pen. Code, § 4.) What justice will be promoted, what objects effectuated, by construing "human being" as excluding Baby Girl Vogt and her unfortunate successors? Was defendant's brutal act of stomping her to death any less an act of homicide than the murder of a newly born baby? No one doubts that the term "human being" would include the elderly or dying persons whose potential for life has nearly lapsed; their proximity to death is deemed immaterial. There is no sound reason for denying the viable fetus, with its unbounded potential for life, the same status.

The majority also suggest that such an interpretation of our homicide statutes would deny defendant "fair warning" that his act was punishable as a crime. (*Ante,* p. 634.) Aside from the absurdity of the underlying premise that defendant consulted Coke, Blackstone or Hale before kicking Baby Girl Vogt to death, it is clear that defendant had adequate notice that his act could constitute homicide. Due process only precludes prosecution under a new statute insufficiently explicit regarding the specific conduct proscribed, or under a preexisting statute "by means of an unforeseeable *judicial* enlargement thereof." (*Ante,* p. 634.)

Our homicide statutes have been in effect in this state since 1850. The fact that the California courts have not been called upon to determine the precise question before us does not render "unforeseeable" a decision which determines that a viable fetus is a "human being" under those statutes. Can defendant really claim suprise that a 5-pound, 18-inch, 34-week-old, living, viable child is considered to be a human being?

The fact is that the foregoing construction of our homicide statutes easily could have been anticipated from strong dicta in *People* v. *Chavez, supra,* 77 Cal.App.2d 621, 625-626 (hg. den. by S.Ct.), wherein the court reviewed common law precedents but disapproved their requirement that the child be born alive and completely separated from its mother. The court in *Chavez* held that a viable child killed during, but prior to completion of, the birth process, was a human being under the homicide statutes. However, the court did not hold that partial birth was a prerequisite, for the court expressly set forth its holding "Without drawing a line of distinction applicable to all cases . . . ." (77 Cal.App.2d at p. 627.) In dicta, the court discussed the question when an unborn infant becomes a human being under the homicide statutes, as follows: "There is not much change in the child itself between a moment before and a moment after its expulsion from the body of its mother, and normally, while still

dependent upon its mother, the child for some time before it is born, has not only the possibility but a strong probability of an ability to live an independent life. . . . While before birth or removal it is in a sense dependent upon its mother for life, there is another sense in which it has started an independent existence after it has reached a state of development where it is capable of living and where it will, in the normal course of nature and with ordinary care, continue to live and grow as a separate being. While it may not be possible to draw an exact line applicable to all cases, the rules of law should recognize and make some attempt to follow the natural and scientific facts to which they relate. . . . [I]t would be a mere fiction to hold that a child is not a human being because the process of birth has not been fully completed, when it has reached that state of viability when the destruction of the life of its mother would not end its existence and when, if separated from the mother naturally or by artificial means, it will live and grow in the normal manner." (77 Cal. App.2d at pp. 625-626.)

Thus the *Chavez* case explodes the majority's premise that a viability test for defining "human being" under our homicide statutes was unforeseeable; *Chavez* approved and advocated this interpretation 23 years ago. (See also *Scott* v. *McPheeters,* 33 Cal.App.2d 629, 635 [92 P.2d 678, 93 P.2d 562] ["Who may say that such a viable child is not in fact a human being in actual existence?"].) I would conclude that defendant had sufficient notice that the words "human being" could include a viable fetus. As stated in *People* v. *Victor,* 62 Cal.2d 280, 299 [42 Cal.Rptr. 199, 398 P.2d 391], "Admittedly the word ['imminent'] is to some extent a relative one; but 'the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree.' [Citation.]"

In summary, I have shown that at common law, the slaying of a quickened fetus was a "great misprision" and was severely punished, since that fetus was considered to be a human being. We should not presume that the Legislature ignored these common law developments and intended to punish the malicious killing of a viable fetus as the lesser offense of illegal abortion. Moreover, apart from the common law approach, our Legislature has expressly directed us to construe the homicide statutes in accordance with the fair import of their terms. There is no good reason why a fully viable fetus should not be considered a "human being" under those statutes. To so construe them would not create any new offense, and would not deny defendant fair warning or due process since the *Chavez* case anticipated that construction long ago.

The trial court's denial of defendant's motion to set aside the information was proper, and the peremptory writ of prohibition should be denied.

Sullivan, J., concurred.

The petition of the real party in interest for a rehearing was denied September 10, 1970. Burke, J., and Sullivan, J., were of the opinion that the petition should be granted.