[Crim..No. 15499. Fourth Dist., Div. One. Oct. 17, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
GERALD RAYMOND HAYNES et al., Defendants and Appellants.

**COUNSEL**

Jonathan M. Purver, Jeffrey J. Stuetz and L. Elizabeth Corpora, under appointments by the Court of Appeal, for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Jay M. Bloom and John W. Carney, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BUTLER, J.**—Edrick Jordan was convicted by a jury of armed robbery (Pen. Code,[1] §§ 211 and 12022.5) and possessing a sawed-off shotgun (§ 12020, subd. (a)). In the same proceeding, Gerald Raymond Haynes was convicted of robbery (§ 211) and found to have been armed with a firearm during the commission of the crime (§ 12022, subd. (a)).

---

[1]All statutory references are to the Penal Code unless otherwise specified.

The court sentenced Jordan to five years—the midterm of three years for the robbery and two years consecutive for the use of the firearm. Imposition of sentence on the possession charge was stayed. Haynes, who was 17 years old when the robbery was committed, was found not suitable for commitment to the Youth Authority (YA) and was sentenced to the upper term of five years for the robbery with an additional one year enhancement for being armed during the crime. Haynes' total commitment was six years.

Both Jordan and Haynes appeal their convictions; the actions have been consolidated for review by this court. Jordan argues (1) the court's refusal to consider YA commitment and imposition of a mandatory prison sentence is a denial of equal protection; (2) the imposition of a prison sentence in this case is cruel and unusual punishment; (3) the court erred by admitting evidence of a coparticipant's plea of guilty and admission to the use of a firearm; (4) the admission of the plea violates Jordan's Sixth Amendment right to confrontation; and (5) a number of instructional errors and a sentencing error. Haynes' appeal focuses solely on the use of the plea and the resulting Sixth Amendment confrontation issues.

The appellants' contentions are without merit; we affirm the convictions.

I

In 1982, Jordan, Haynes, Lee Smith and Donald Bowman lived in the same neighborhood. They were all either 17 or 18 years old. During the summer of that year, Bowman's cousin, Tony Toomer, resided with Bowman's family. Toomer, who was 17 years old, owned a sawed-off shotgun.

On the morning of September 30, 1982, Toomer, Smith, Jordan and Bowman were "cruising" in Bowman's car. Toomer had his shotgun with him; the boys talked about "pulling a robbery." Smith was driving; they stopped at two stores with the intent of committing robbery; each time their attempts were aborted. At noon, the group dropped Bowman off at his house and picked up Haynes. The robbery was still on.

At about 1:30 in the afternoon, Smith stopped at a Checker Auto Store. Toomer, Jordan and Haynes entered the store. Smith stayed with the car, which was overheating, to keep the engine' running. Jordan carried the sawed-off shotgun concealed in his clothing.

At work inside the store were the manager, Ruby Loya, assistant manager, Jerry Turner, and cashier, Tensie Bell. The boys asked about battery cables and were directed to the appropriate section of the store by Turner. They chose a cable and returned to the counter; Bell rang up the sale. The trio then professed confusion: first, they had picked up the wrong cable; next, they didn't have any money. A second set of battery cables was picked

out. Bell told the boys she would ring up the second sale when they paid for the first.

By this time another customer, Rufus Ivor, had entered the store. As Turner turned to assist Ivor, Jordan moved forward, produced the sawed-off shotgun and said, "Get your hands up. This is a robbery. Get your hands up." Turner complied immediately. Ivor, who was confused and disoriented, hesitated. Jordan repeated the "hands-up" order; Turner pleaded with Ivor to "do as he says." Jordan then forced the two men into a back room and told them to lie down. He asked whether the store had a safe.

Bell saw Turner raise his hands in response to Jordan's demand. Before she could react, Toomer came to her side of the counter and demanded the money from the register. Bell gave him the cash from the drawer. Toomer searched under the drawer for larger bills. Toomer next wanted the keys to the safe; Bell told him the manager, Loya, carried the keys. Toomer then forced Bell into the back room, told her to lie down on the floor next to Turner and Ivor. Jordan stood watch with the shotgun.

In the meantime, Haynes approached Loya. From where she was standing, she could see Turner with his hands in the air. Haynes told her to "[j]ust stay calm" and led her to the back room. On the way, Loya saw Bell opening the register for Toomer. When the two reached the safe, Loya had difficulty opening it; Haynes eventually lost his temper; he told her to "[g]et the fucking door open." By this time, Toomer was standing nearby; he made the same statement. Inside the safe, there were two money bags. Haynes grabbed the "blue safe fund bag" and put it in his pocket. Toomer removed a red deposit bag and stuck it down the front of his pants.

The three robbers then ran from the store; all three jumped in the waiting car and headed west up an alley; the overheated car gave out three blocks away. The boys got out, ran to a bus stop, got change and rode to Encanto where Smith's aunt lived. Once inside the aunt's house, the group split up the loot and all but Smith departed. The police picked Smith up about 4 p.m. During questioning at juvenile hall, he admitted his involvement in the robbery and pointed out the residences of his three accomplices. Jordan, Haynes and Toomer were then arrested and charged with the robbery.

## II

Before trial, Toomer pled guilty to the robbery and admitted being armed with a weapon for purposes of enhancement. The cases against Haynes and Jordan were consolidated; these two defendants proceeded to trial.

In addition to the testimony of Bell, Turner, Loya and Ivor concerning the defendants' activity inside the store, the prosecution questioned several

other witnesses. Bruce West saw one of the aborted robbery attempts earlier in the day. He became suspicious when he spotted two men wearing stockings on their heads emerging from a Car Color Supply store at around 10:30 a.m. on the morning of the robbery. West wrote down the license plate number of the car and called the police, but the suspects had left the scene before the police arrived. In court, West identified Jordan and Smith as two of the occupants of the getaway car; the license number he wrote down matched that of Bowman's car.

Kingsley Hanger lived across an alley behind the Checker Auto store. At about 1:30 p.m. on the afternoon of the robbery, Hanger observed a car parked in the lot next to the store. The car's radiator was leaking. The driver jumped out of the car, quickly checked under the hood, returned to the car and cramped the wheels to the right, as if to make ready for a quick exit. Shortly afterward, Hanger saw three men "running pall mall" from the store. They jumped into the waiting car and fled "down the alley as fast as they could go."

Arnold Galloway testified he stopped at the Checker Auto store at around 1:30 p.m. on the day of the robbery. He parked a short distance from a car which appeared to be leaking some type of fluid. As he entered the store, a young man told him to "[g]et the fuck out of here." He saw a young woman standing next to the safe; she appeared to be nervous. Galloway turned and departed immediately. When he got outside, he saw three men running from the store toward the leaking automobile. One dropped a blue pouch and stopped to pick it up. Under direct examination, he identified the person as Jordan. On cross, he waffled. According to Loya, Haynes had the blue bag. All three got in the car and headed west up the alley.

The prosecution also proposed to call Toomer as a witness. Toomer, who had already pled guilty to the robbery, was in the spectator section of the courtroom during the trial. Turner, Bell and Loya identified Toomer as one of the robbers. His testimony would (1) reinforce the credibility of Turner, Bell and Loya; and (2) prove the firearm used in the robbery was real. Defense counsel objected to the proposed questioning—the necessary reference to Toomer's guilty plea would be unduly prejudicial under Evidence Code section 352.[2]

Outside the presence of the jury, Toomer refused to answer any questions, claiming his Fifth Amendment privilege. The court then found Toomer was unavailable as a witness under Evidence Code section 240 and proposed to advise the jury of the guilty plea as a declaration against interest under

---

[2]Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Evidence Code section 1230. The court informed the jury as follows: ". . . I did not mention the name of Tony Toomer. . . . [Y]ou are to take as a matter of fact, for your consideration, the fact that Tony Toomer pleaded guilty to the crime of robbery in violation of Penal Code Section 211. [¶] And, further, he admitted that he was armed with a firearm. He did not admit that he personally used the firearm, but that he was armed with a firearm . . . . [¶] So, therefore, in the same manner that the allegation is that Mr. Jordan personally used a firearm, the second allegation was that both Toomer and Haynes were armed with a firearm."

At the instructional phase of trial, the court instructed the jury: "Now, evidence has been received of a guilty plea to robbery and the admission of being armed with a firearm. I'm talking about Toomer, Tony Toomer. [¶] You are instructed that you must not consider the evidence of such a guilty plea as against the other defendants except for the following purposes: [¶] One, for judging the credibility of identification witnesses; [¶] and, two, for resolving the question of whether or not a real firearm was used."

### III

We first address Jordan's contention Welfare and Institutions Code section 1732.5 (section 1732.5)[3] violates equal protection of the law. Section 1732.5, added by Proposition 8, approved by the people June 8, 1982, effective June 9, 1982, precludes a YA commitment for youthful offenders 18 years of age or older convicted of murder, rape or any other serious felony defined in Penal Code section 1192.7. Youths between the ages of 16 and 18 convicted in the adult court of like offenses are eligible for YA commitment (Welf. & Inst. Code, § 1731.5).

Although the court did not refer specifically to section 1732.5,[4] Jordan's counsel argues and we will assume the court's conclusion Jordan was ineligible for YA commitment was based on that statute. Robbery and use of a firearm are both serious felonies under Penal Code section 1192.7 and Jordan was 18 at the time of the offense.

We restate Jordan's argument. Persons between the ages of 16 and 18 who are found not to be fit or proper subjects for juvenile court disposition

---

[3]Welfare and Institutions Code section 1732.5 provides: "Notwithstanding any other provision of law, no person convicted of murder, rape or any other serious felony, as defined in Section 1192.7 of the Penal Code, committed when he or she was 18 years of age or older shall be committed to Youth Authority. [¶] The provisions of this section shall not be amended by the Legislature except by statute passed in each house by rollcall vote entered in the journal, two-thirds of the membership concurring, or by a statute that becomes effective only when approved by the electors."

[4]The court stated Jordan "is ineligible for CYA because of his conduct, because of what he was convicted. But I agree in the second instance, that I am not going to remand him to CYA for the reasons of the nature of the crime and the way it was committed, regardless of his age."

are remanded to adult courts for criminal proceedings. Upon conviction of any public offense including murder, rape and the section 1192.7 felonies, such person may be committed to YA. However, a person 18 to 21 years of age convicted of murder, rape, or the other serious felonies defined in section 1192.7, may not be committed to YA. As persons between the ages of 16 and 18 and persons between the ages of 18 and 21 are similarly situated, those falling within the latter category who are convicted of murder, rape or the other section 1192.7 serious felonies are denied the equal protection of the law.

██ The concept of equal protection of the law compels recognition that persons similarly situated with respect to the legitimate purpose of the law receive like treatment. (*Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566, 578 [79 Cal.Rptr. 77, 456 P.2d 645, 38 A.L.R.3d 1194].) The first prerequisite to a meritorious claim under the equal protection clause is a showing the state has adopted a classification that affects two or more similarly situated groups in an unequal manner. (*In re Roger S.* (1977) 19 Cal.3d 921, 934 [141 Cal.Rptr. 298, 569 P.2d 1286], quoting *Tigner* v. *Texas* (1940) 310 U.S. 141, 147 [84 L.Ed. 1124, 1128, 60 S.Ct. 879, 130 A.L.R. 1321], " '[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same.' ")

██ The Legislature has classified only persons under the age of 18 who violate laws within the jurisdiction of the juvenile court (Welf. & Inst. Code, § 602). Persons 18 years of age and older are subject to the jurisdiction of the superior court if charged with a felony and the municipal or justice court as to lesser offenses. Youths 16 to 18 years of age who are found to be not amenable to the care, treatment and training of the juvenile court are remanded to the criminal court for prosecution as adults. That remand is required to be exercised in the discretion of the juvenile court following specific guidelines (Welf. & Inst. Code, § 707). The adult aged 18 to 21 is, from the outset, within the jurisdiction of the criminal court. The minor, aged 16 to 18, comes within that jurisdiction only upon a remand from the juvenile court. Such adult and such minor are not similarly situated with respect to the tribunal before which they initially appear. While their progress through the criminal court thereafter may be said to cause them to be similarly situated during such proceedings, the state continues its paternal interest in the sentencing disposition of the minor. ██ "[T]he most significant difference between minors and adults is that '[t]he liberty interest of a minor is qualitatively different from that of an adult, being subject . . . to reasonable regulation by the state to an extent not permissible with adults . . . .' " (*In re Eric J.* (1979) 25 Cal.3d 522, 530 [159 Cal.Rptr. 317, 601 P.2d 549].)

*In re Herrera* (1943) 23 Cal.2d 206 [143 P.2d 345], disapproved on another point in *People* v. *Olivas* (1976) 17 Cal.3d 236, 257 [131 Cal.Rptr.

55, 551 P.2d 375], early on held a classification of youthful offender by age is not unreasonable. "In the present case there is nothing unreasonable in fixing the age of 23 as the line for the treatment of youthful offenders by the Authority. ■ While section 25 of the Civil Code fixes 21 as the upper age limit of minors for general purposes, the Legislature is free to exercise its judgment in fixing the age limits of minority for particular purposes. 'It cannot be questioned that the age of majority is a matter of legislative regulation and that the legislature may prescribe a longer period of minority for some purposes than for others.' [Citations.]

"There is no forbidden discrimination in the classification of those who are ineligible for commitment to the Authority even though they meet the age requirement. The Legislature may properly regard life imprisonment or the death penalty as necessary for the protection of the public in the case of grave offenses, just as it may regard imprisonment for not less than 90 days or the payment of a fine as adequate in the case of minor offenses." (*Id.*, 23 Cal.2d at p. 213.)

■ The purpose of a YA commitment is to substitute training and treatment for retributive punishment with a view toward the correction and rehabilitation of young persons who have committed public offenses. (*In re Aline D.* (1975) 14 Cal.3d 557, 567 [121 Cal.Rptr. 816, 536 P.2d 65]; Welf. & Inst. Code, § 1700.) On the other hand, the Uniform Determinate Sentencing Act made a significant change in penal philosophy regarding adult offenders. The purpose of imprisonment for crime is punishment. (§ 1170, subd. (a)(1).)

■ The authority placed in the criminal court to place an adult offender less than 21 years of age in YA is a statutory privilege granted by the Legislature and is not a right (*People* v. *Woolbert* (1965) 232 Cal.App.2d 544, 547 [42 Cal.Rptr. 919].) That privilege under Welfare and Institutions Code section 1731.5 has been narrowed by the enactment by the people of Welfare and Institutions Code section 1732.5. As the Legislature's authority includes the right to prescribe punishment for crime (*Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 631 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420]), the privilege of YA placement consideration may be denied to those convicted of offenses deemed by the Legislature to merit punishment, not rehabilitation. (*People* v. *Dillon* (1983) 34 Cal.3d 441, 477-478 [194 Cal.Rptr. 390, 668 P.2d 697]; *People* v. *Grisso* (1980) 104 Cal.App.3d 380, 389 [163 Cal.Rptr. 547].)

■ We deal here with sentencing discretion, not with a fundamental interest such as liberty. The proper standard is whether the challenged distinction rationally furthers some legitimate, articulated state purpose. (*People* v. *Grisso, supra,* 104 Cal.App.3d at p. 399.) By their adoption of Welfare and Institutions Code section 1732.5, the people have declared youthful

offenders over the age of 18 who have been convicted of murder, rape and section 1192.7 serious felonies should be separated from those involved in less serious crime.

We conclude adults aged 18 to 21 who commit section 1192.7 felonies and are ineligible for YA consideration are not similarly situated with minors aged 16 to 18 who commit like felonies and are eligible for YA consideration. The challenged distinction serves a legitimate state purpose. Jordan has not been denied the equal protection of the law.

IV

Jordan also contends Welfare and Institutions Code section 1732.5 prohibiting a YA consideration and compelling prison commitment[5] constitutes cruel and unusual punishment; the imposition of a prison sentence in this case violates constitutional standards. (*In re Lynch* (1972) 8 Cal.3d 410 [105 Cal.Rptr. 217, 503 P.2d 921].)

The Welfare and Institutions Code section 1731.5 statutory limitation prohibiting YA commitment upon a juvenile's conviction of first degree murder does not itself constitute cruel or unusual punishment. (*People* v. *Chi Ko Wong* (1976) 18 Cal.3d 698, 725-726 [135 Cal.Rptr. 392, 557 P.2d 976]; *People* v. *Grisso, supra,* 104 Cal.App.3d at p. 385.) However, *People* v. *Dillon, supra,* 34 Cal.3d 441, requires the court determine whether the prescribed punishment in a particular case is "cruel or unusual" under the specific circumstances: "In the exercise of that function we adopted in *Lynch* the rule that a statutory punishment may violate the constitutional prohibition not only if it is inflicted by a cruel or unusual method, but also if it is grossly disproportionate to the offense for which it is imposed. We recognized that 'Whether a particular punishment is disproportionate to the offense is, of course, a question of degree. The choice of fitting and proper penalties is not an exact science, but a legislative skill involving an appraisal of the evils to be corrected, the weighing of practical alternatives, consideration of relevant policy factors, and responsiveness to the public will; in appropriate cases, some leeway for experimentation may also be permissible. The judiciary, accordingly, should not interfere in this process unless a statute prescribes a penalty "out of all proportion to the offense" [citations], i.e., so severe in relation to the crime as to violate the prohibition against cruel or unusual punishment.' ([*In re Lynch, supra,* 8 Cal.3d] at pp. 423-424.) Undertaking to define that limit for future cases, we explained that the state must exercise its power to prescribe penalties within the limits of civilized standards and must treat its members with respect for their intrinsic worth as human beings: 'Punishment which is so excessive as to transgress those limits and deny that worth cannot be toler-

---

[5]Jordan is not eligible for probation under section 1203.06, subdivision (a)(1)(iii).

ated.' (*Id.*, at p. 424.) We concluded (*ibid.*) that a punishment may violate the California constitutional prohibition 'if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.'" (*People* v. *Dillon, supra,* 34 Cal.3d at p. 478, fn. omitted.)

■ In this appeal, Jordan does not argue his sentence is disproportionate per se. Rather, he contends his place of confinement (i.e., prison rather than YA) constitutes cruel and unusual punishment. On its face, imprisonment for robbery and use of a sawed-off shotgun is an acceptable means of punishment. It does not shock the conscience; is not of a barbarous character; does not violate standards of decency. (*People* v. *Main* (1984) 152 Cal.App.3d 686, 695 [199 Cal.Rptr. 683].) Jordan's argument does not persuade.

## V

■ We next address the appellants' common contention the admission of Toomer's guilty plea and admission to gun use constitutes reversible error; it does not appear from the record the court weighed the probative value of the evidence against its prejudicial effect as required by Evidence Code section 352; failure to do so constitutes error. (See *People* v. *Green* (1980) 27 Cal.3d 1, 24 [164 Cal.Rptr. 1, 609 P.2d 468]; *People* v. *Cardenas* (1982) 31 Cal.3d 897, 904-905 [184 Cal.Rptr. 165, 647 P.2d 569].)

Assuming without deciding the court erred in failing to weigh the prejudicial effect of Toomer's guilty plea, the admission of such evidence does not require reversal of the appellants' convictions. Smith's testimony, to which neither of the defendants objected, tells the entire story: use of his cousin's car, the passenger list, the presence of the sawed-off shotgun, the aimless cruising about to spot a robbery site, the aborted attempts, the selection of Jordan as the cannoneer, the Checker store stop, the boiling radiator, the getaway, the split of the spoils and his apprehension shortly afterward. Corroboration comes from West, who observed the first aborted effort in the cruise. Turner and Bell identified all three of the robbers; Loya identified all but Jordan; Ivor identified Jordan and the weapon. Hanger saw three men run from the Checker store and take off in a getaway car; Galloway saw the same happening and the dropping of a blue pouch. The conflicts between Galloway's identification of Jordan as the carrier of the blue pouch and Loya's testimony Haynes pocketed the blue pouch inside the store are insignificant in light of the other eyewitness identifications.

*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], mandates we determine from the whole record whether it is reasonably probable that without the error a result more favorable to the defendants would have occurred. We do not understand the prosecution's insistence on admission

of Toomer's plea, which at best was cumulative and introduced potential reversible error in an otherwise slam-dunk case. The evidence of guilt excluding Toomer's plea was overwhelming. ██ ██ ██ ██ ██ Admission of the plea and the enhancement was harmless error. (*People* v. *Coble* (1976) 65 Cal.App.3d 187, 197 [135 Cal.Rptr. 199]; *People* v. *Claxton* (1982) 129 Cal.App.3d 638, 666 [181 Cal.Rptr. 281].)[6]

## VI

At trial, Turner testified (during cross-examination) he was a rifle and skeet instructor for three years; he used a .410 shotgun to shoot skeet; and owned two or three .410 shotguns. Jordan's lawyer asked Turner for his opinion as to the make and model of the .410 allegedly carried by Jordan. ██ ██ Turner testified at length about the sawed-off shotgun used by Jordan—bore size, metal thickness and bolt action. In effect, Turner testified it was the real thing.[7]

██ On appeal, Jordan suggests Turner was an expert witness; the court *sua sponte* should have given the expert witness instruction called for by Penal Code section 1127b,[8] and failure to do so was error. This argument is without merit.

First, the section 1127b instruction must be given *sua sponte* only where expert testimony has been received. (*People* v. *Reeder* (1976) 65

---

[6]Jordan and Haynes contend admission of the plea also violates their Sixth Amendment right to confrontation and cross-examination. As we have concluded any court error in admitting the plea is harmless, we need not address the Sixth Amendment claim. Courts do not reach constitutional questions unless absolutely required to do so to dispose of the issues before them. (*People* v. *Leonard* (1983) 34 Cal.3d 183, 187 [193 Cal.Rptr. 171, 666 P.2d 28]; see *DeLancie* v. *Superior Court* (1982) 31 Cal.3d 865, 877 [183 Cal.Rptr. 866, 647 P.2d 142]; *People* v. *Green, supra,* 27 Cal.3d at p. 50.)

[7]In a supplemental brief, Jordan contends the loss of stenographer's notes of an *in camera* hearing denied him the right of a complete appellate transcript on the issue of whether the court's ruling to excuse Smith was proper. Jordan asserts Smith's further testimony was material to establish whether the gun was real; because trial counsel indicated he had no recollection of what transpired at the hearing, the loss of the notes deprived Jordan of due process of the law and the judgment must be vacated.

Absent "any plausible showing that the lost notes contained anything of substance upon which a reversal of the judgment could be predicated, the fortuitous event of the loss does not warrant a vacation of the judgment, which in turn would require a new trial." (*People* v. *Morales* (1979) 88 Cal.App.3d 259, 268, appendix A [151 Cal.Rptr. 610]; see *People* v. *Barnard* (1982) 138 Cal.App.3d 400, 408 [188 Cal.Rptr. 176]; *People* v. *Jones* (1981) 125 Cal.App.3d 298, 300 [178 Cal.Rptr. 44].) Turner's testimony alone is sufficient to support a finding the weapon was real.

[8]Section 1127b provides: "When, in any criminal trial or proceeding, the opinion of any expert witness is received in evidence, the court shall instruct the jury substantially as follows: [¶] Duly qualified experts may give their opinions on questions in controversy at a trial. To assist the jury in deciding such questions, the jury may consider the opinion with the reasons stated therefor, if any, by the expert who gives the opinion. The jury is not bound to accept the opinion of any expert as conclusive, but should give to it the weight to which they shall find it to be entitled. The jury may, however, disregard any such opinion, if it shall be found by them to be unreasonable. [¶] No further instruction on the subject of opinion evidence need be given." (CALJIC No. 2.80.)

Cal.App.3d 235, 241 [135 Cal.Rptr. 421].) Here, Turner testified as a percipient witness to the robbery and Jordan's counsel elicited detailed testimony concerning his knowledge of .410 shotguns in an effort to undermine his credibility. Turner was not called or qualified as an expert witness.[9]

Secondly, even assuming (which we do not) Turner's testimony called for the section 1127b instruction, failure to give it is not prejudicial unless the reviewing court, upon an examination of the entire record, determines a different finding of gun use might have been rendered by the jury. (*People v. Lynch* (1971) 14 Cal.App.3d 602, 610 [92 Cal.Rptr. 411].) Review of the entire record persuades us any failure to instruct on expert opinion was harmless error.

## VII

The court sentenced Jordan to the midterm of three years for the robbery and two years for the shotgun use for a total of five years. In its sentencing elocution, the court noted four circumstances in aggravation, including vulnerability of the victims, and three circumstances in mitigation. Jordan claims sentencing error, arguing the vulnerability of the victims was predicated upon the fact of gun use. As his sentence was enhanced two years for use of the gun, the court was precluded from a consideration of vulnerability of the victims on that score as a circumstance in aggravation.

A court may not impose an *upper* term by using the fact of a gun use enhancement on a sentence. (Pen. Code, § 1170, subd. (b).) Under California Rules of Court, rule 441(a), a fact considered in determining a defendant is ineligible for probation may be used to impose the *upper* term or for enhancement. A fact charged and found as an enhancement may be used to impose the *upper* term in which event the fact as an enhancement is stricken. (Rule 441(b).) A fact used to enhance a sentence may not be used to impose the *upper* term. (Rule 441(c).)

Here, Jordan received the midterm. His attempt to analogize the court's midterm sentence choice in this case to imposition of an upper term is not supported by the law. "It is clear from the statutes and rules that once the sentencing court has rejected probation it need not state reasons for imposing the middle term of imprisonment as distinguished from the upper or lower term. Penal Code section 1170, subdivision (b), so indicates

---

[9]Evidence Code section 720 defines an expert: "(a) A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates. Against the objection of a party, such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert. [¶] (b) A witness' special knowledge, skill, experience, training, or education may be shown by any otherwise admissible evidence, including his own testimony."

by requiring 'reasons for imposing the upper or lower term.' Rule 439(d) so confirms by limiting the court's obligation to state reasons to 'reasons for imprisonment.' [Citation.] On the other hand section 1170, subdivision (c), imposes upon the court the duty of stating reasons for its 'sentence choice,' which as is made plain by rule 405(f) juxtaposes a prison sentence with a probationary sentence (or other disposition more favorable yet to the criminal). Thus the court must state reasons for granting or denying probation, but once it denies probation it need only state further reasons if it does not impose the middle term." (*People* v. *Arceo* (1979) 95 Cal.App.3d 117, 121 [157 Cal.Rptr. 10].)

 The court used the fact of Jordan's gun use to deny probation; no statement of reasons was then necessary to impose the middle term. (*Arceo, supra,* 95 Cal.App.3d 117) There is no dual use of facts proscription in using the same fact to deny probation and enhance a sentence. (Rule 441(a).) That the court extensively reviewed and commented upon the mitigating and aggravating circumstances merely shows it properly weighed all factors and concluded the middle base term was appropriate. (*People* v. *Le* (1984) 154 Cal.App.3d 1, 12-13 [200 Cal.Rptr. 839].) We find no sentencing error.

## VIII

Jordan claims instructional error in the court's instruction on the specific intent required in robbery. The original trial transcript shows property is required to be taken "with the specific intent *personally* to deprive such person of the property." (Italics added.)

The reporter has corrected the transcript to show the correct word "permanently" was used by the court instead of "personally." *De minimis non curat lex.*

Judgments affirmed.

Wiener, Acting P. J., and Work, J., concurred.

Petitions for a rehearing were denied November 9, 1984, and the opinion was modified to read as printed above. Appellants' petitions for a hearing by the Supreme Court were denied January 24, 1985.